IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 31, 2011 Session

IN RE: DEMITRUS M. T., A CHILD UNDER 18 YEARS OF AGE, ET AL.

Appeal from the Tennessee Claims Commission

No. 20050569 William O. Shults, Commissioner

No. E2009-02349-COA-R3-CV - Filed March 14, 2011

This is a wrongful death action filed in the Tennessee Claims Commission ("the Commission") by the parents and brother ("the Claimants") of six month old Demitrus M. T. ("the Infant" or "Demitrus"), individually and on behalf of Demitrus, after he drowned in a bathtub while in the care of Sherika Hamilton, a friend of the family identified in a Tennessee Department of Child Services ("DCS" or "the Department") safety plan as the "placement caretaker." There is no dispute that Hamilton left the Infant unattended in the bathtub while she was otherwise occupied in an adjacent room. The primary disputes at trial before the Commissioner, and on appeal, are whether the Infant was in the "care, custody and control" of the Department so as to provide jurisdiction to the Commission; whether the Department's "Case Recordings," some of which were made more than a month after the event they purport to record, are inadmissible hearsay; and whether it was foreseeable to the Department that Hamilton would leave the helpless Infant unattended in a bathtub and let him drown. The Commission found that it had jurisdiction because the Department had control of the Infant even though it did not have custody, that the Case Recordings were admissible, and that the Department was not negligent because it could not have foreseen this tragic event. The Claimants appeal. We affirm in part, reverse in part, and vacate the dismissal on the merits.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed in Part, Reversed in Part and Vacated in Part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Arthur M. Fowler, III, Johnson City, Tennessee, for the appellants, Wayne T., Kelly C. and Thunder N. bnf Kelly C.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and David Sadlow, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

**OPINION**

I.

A.

Demitrus was born April 25, 2004, to mother Kelly C. ("the Mother") and Wayne T. ("the Father"). He died tragically by drowning on November 10, 2004. Demitrus was survived by the Mother, the Father, and a brother named Thunder N. The Father, the Mother, and Thunder are "the Claimants" in this case. The Father and the Mother were never married although they lived together a brief time, including November 2004.

B.

The claim is asserted in narrative form and provides a helpful overview of the case, provided it is read with the understanding that some of the statements in the claim are disputed:

> [The Department] became intimately involved in [Demitrus'] life on November 4, 2004. On that afternoon, [DCS] employee Michael Flanary visited Tyler Apartments in Johnson City while [the Father] and [the Mother] . . . were running errands. During his visit, Flanary learned that [the Father] and [the Mother], along with their two young children, were living temporarily with a relative in a small apartment at the complex. Mr. Flanary left word for [the Father] to contact him by telephone. Mr. Flanary allegedly threatened to take the children into [DCS] custody if [the Father] did not contact him within three hours. When [the Father] returned to the apartment complex, he received Mr. Flanary's message and promptly telephoned Mr. Flanary. Mr. Flanary instructed [the Father] and [the Mother] to come to the [DCS] office immediately for a meeting. During that meeting, which took place on the afternoon of Nov. 4, 2004, Mr. Flanary told [the Father] and [the Mother] that their children should be placed in a "safe" environment until the couple could secure a satisfactory residence. Mr. Flanary wrote out a "safety

-2-

plan" that placed three-year-old Thunder . . . and six-month-old Demetrius . . . in the custody of Sherika Hamilton for seven days. "The children will be safe with Miss Sherika Hamilton, of Tyler Apartment, Apt. #4, Bldg. 5," the plan says. . . . . The plan was signed by [the Father] and [the Mother] , Ms. Hamilton, Mr. Flanary, and [DCS] employees Eve McCardle and Kim Crumley.

Sherika Hamilton is 24 years old, single, and has had little or no experience caring for children. She lived in a small, government-subsidized apartment at Tyler Apartments in Johnson City. There is no evidence to suggest the [DCS] conducted any investigation as to whether Ms. Hamilton was capable of caring for an infant. There is also no evidence that the [Department] did any investigation into Ms. Hamilton's background or character, as required by statute, and there is no evidence that the [Department] inspected the apartment where the children would be staying with Ms. Hamilton. In fact, my investigation reveals that Wayne Weaver, the manager of the Tyler Apartment complex, in front of at least one witness, verbally advised Mr. Flanary against leaving the children in the care of Sherika Hamilton because Mr. Weaver had concerns about Ms. Hamilton's character and her ability to care for small children.

The "safety plan" required that [the Father] and [the Mother] find suitable housing before their children could be returned. They found a suitable place on Nov. 5, 2004, and immediately began efforts to secure the necessary funds to rent the apartment. They requested that the children be returned to them in the interim, but Mr. Flanary told them that the safety plan called for a seven-day placement and that he intended to follow the plan.

On the afternoon of November 9, 2004, Johnson City Police Officer Billy Mitchell was performing his regular duties as a community patrol officer at Tyler Apartments. Officer Mitchell noticed three small children alone on a concrete porch outside Building Five, the building where Sherika Hamilton resided. Officer Mitchell asked neighbors whether they knew who was caring for the children. He was told that Sherika Hamilton was

supposed to be watching the children, however, nobody knew where Ms. Hamilton had gone. Officer Mitchell arranged for a neighbor to watch the children while he searched for Ms. Hamilton. She appeared approximately 40 minutes later, and she was unable to offer any reasonable explanation as to where she had been or why she had left the children unattended. Officer Mitchell charged Ms. Hamilton with three counts of reckless endangerment because she had left the children unattended for such a long time. Two of the children were Demetrius . . . and Thunder . . . , the same children Michael Flanary had placed in the care of Sherika Hamilton, under the authority of the [Department].

[The Father] was contacted by a relative within an hour of Ms. Hamilton being charged with reckless endangerment. [The Father,] in turn, contacted [DCS] case manager Mike Flanary by phone on that same afternoon. [The Father] informed Mr. Flanary that Ms. Hamilton had been charged with reckless endangerment by the police for neglecting the children. He asked Mr. Flanary to either return the children immediately or to have them placed in a safer environment.

Mr. Flanary, on behalf of the [Department], denied the request. He told [the Father] that Mr. Flanary was having "personal problems" and that he did not have time to deal with the situation. He apparently did not contact the police to confirm [the Father's] claims, and he did not contact Ms. Hamilton or otherwise check on the welfare of the two children he had entrusted to her. He apparently did not leave instructions for any other [DCS] employee to investigate or otherwise deal with the situation.

The next day, Nov. 10, 2004, at approximately 6:00 p.m., Demetrius . . . drowned after Sherika Hamilton left him unattended in a bathtub at 71 Charleston Square, Southgate Village Apartments, in Johnson City, Tennessee.

Ms. Hamilton has been charged by law enforcement authorities in Washington County for aggravated child abuse and neglect. Evidence at her preliminary hearing revealed that she placed

-4-

Demitrius in the bathtub and left him there, alone, for approximately 30 minutes. When she returned, Demetrius was floating face-down in the water. He had turned blue. Efforts to revive him were unsuccessful.

* * *

Demitrius's parents . . . allege that the [Department] was negligent by virtue of its placement of Demetrius and Thunder with Sherika Hamilton. They allege that the [Department] failed to investigate or to conduct any type of meaningful inquiry into Ms. Hamilton's background, character, or ability to care for small children. They allege that the [Department] negligently ignored an attempt by the manager of Tyler Apartments to . . . alert them to the danger of placing the children with Sherika Hamilton. They allege that the [Department] negligently failed to investigate the conditions and circumstances that would be facing the children. They allege that even after having been made aware of the fact that Ms. Hamilton had been charged with recklessly endangering the children on November 9, 2004, the [Department] failed to make even a single inquiry into the welfare of Demetrius . . . and Thunder . . . . They allege that those circumstances breach the standard of care of a "reasonably prudent person" as is required by the statutory and case law in Tennessee. As a direct and proximate result of the [Department's] negligence, Demitrius . . . remained in the care of a person who was unqualified and unable to care for him. That person subsequently left him unattended in a bathtub and Demetrius . . . drowned. . . . .

(Misspelling of the Infant's name as "Demitrius" in original.)

C.

A preliminary issue that the Commission had to resolve was whether it had subject matter jurisdiction over the claim. The Commission denied a motion to dismiss asserting lack of subject matter jurisdiction as a matter of law and reserved jurisdiction as an issue for trial. In its judgment rendered after trial, the Commission treated subject matter jurisdiction as a preliminary issue and devoted approximately 25 pages of analysis, the pertinent part of which we will set forth verbatim, to this "difficult" issue.

Here, there appears to be a consensus that the State never had custody of [the Infant]. As Ms. Par[r]is testified, custody issues are decided by the courts.

However, In Tennessee Code Annotated, Section 9-8-307(a)(1)(E), as *Stewart v. State*, 33 S.W.3d 785, 792 (Tenn. 2000) clearly held, there are found two additional jurisdictional pegs – care and control. Therefore, in solving this jurisdictional inquiry, the Commission must look to the record to determine whether the State exercised care or control over [the Infant]. *Black's Law Dictionary, Sixth Ed.* (1990) defines "control" as the "power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee. The ability to exercise a restraining or directing influence over something." *See Cmty Bank of East Tenn.*, 2004 WL 192408, at *3. The record here seems to be replete with indicia of both care and control in connection with the Department's oversight of [the Infant's] welfare. For example, Ms. Par[r]is testified that the Department was involved with the child's life through the implementation of a Child Safety Plan. In fact, Ms. Crumly testified that "just getting a referral and opening a file means that you're involved in their lives." Ms. Crumly also indicated the extent of the Department's involvement in this case through her testimony that if a child was in a stable home, then the Department would not have to consider moving him. However, here, because Demitrus and his brother, Thunder, were staying in separate households and the Department did not know where the parents were residing, the implication is clear that the Department would be forced to intervene in the family's life. The power and involvement of the Department is further evidenced by the fact that if Demitrus and Thunder were to be returned to their parents, a separate child and family team meeting would have to be held to evaluate the situation. In fact, Ms. Crumly testified that the Children's Protective Service unit has the right to veto a child and family team decision "if the safety of the child is not being addressed." Further, while the Safety Plan was in effect, should the parents fail to abide by its provisions, then the Department would re-evaluate the situation. Also, if the child's placement was changed, Ms. Crumly testified that Mr. Flanary again would have had to have gone through the same procedural

steps carried out on November 4, 2004.

The pure bureaucratic process set out in Regulation 14.8(C)(3) is indicative of the extent of the involvement of the Department in Demitrus' life. That provision directs that a temporary emergency safety plan could not be implemented without the case manager conferring with his team leader and departmental legal counsel.

Further, Ms. Crumly testified that in Demitrus' case, it was a requirement that he stay with Ms. Hamilton until his parents located and set up a home with utilities activated. She went on to state that the parents, Ms. Hamilton, and the Department all had a responsibility to try and ensure the safety of Demitrus . . . .

On November 4, 2004, when Mr. Flanary met with [the Father] and [the Mother], he told them they needed to be under the safety plan. In fact, prior to that, Ms. Par[r]is testified that the case recordings indicated that Flanary told [the Mother's] aunt at her home that unless [the Mother] called him that day, further action would be taken.

These terms and conditions of the Department's dealings with Demitrus . . . are clear evidence that it was involved in his day in-day out care and control to a very large extent. In fact, this intervention into his life and on his behalf, began shortly after his birth when Mr. Flanary justifiably sought to involve he and his mother in the Tennessee Early Intervention Program in order to monitor his growth because of [the Mother's] use of marijuana during her pregnancy.

These powerful indicia of the Department's involvement meet the jurisdictional requirements of Tennessee Code Annotated, section 9-8307(a)(1)(E).

Further, the relationship between the Department and [the] family fits within that category of special relationships resulting in the creation of a duty, discussed by the Court in *Satterfield [v. Breeding Insulation*, 266 S.W.3d 347 (Tenn. 2008)]. These

connections which the Department developed vis-a-vis Demitrus . . ., through its actions almost from birth, "create[d] a sufficiently significant obligation that there [was] an enforceable expectation of reasonable action rather than unreasonable indifference." *Id*. at 360. The creation of this sort of affirmative duty, the Commission finds, based on the facts in this case, fits the Claimants' allegations into the care and control criteria set out in Tennessee Code Annotated, section 9-8-307(a)(1)(E).

This is not to say that every time the Department has any sort of interaction or contact with a family and a child, it will set itself up for a potential claim under Tennessee Code Annotated, section 9-8-307(a)(1)(E). However, where the involvement of departmental personnel is as pervasive and intense as it was in this case, the Department cannot avoid an analysis of its actions or inactions by simply claiming that it did not have formal custody of a child.

The inquiry . . . must be more sophisticated than that.

(Record citations omitted, brackets to correct spelling added).

### D.

The "CPS Safety Plan" referenced in both the claim and the Commissioner's opinion is part of the record in this case. The stated "risk" that generated the need for the plan was, "Family is currently without a home, and the children are staying with a friend and family member. Parents & DCS need to ensure the children are safe and well cared for." As the "desired outcomes," the plan stated, "The children will be safe with Miss Sherika Hamilton, of Tyler Apartment, Apt. #4 Bldg5." The plan listed four numbered "tasks/responsibilities" as follows:

1. Children remain at this residence until [the Mother and the Father] find a residence for their family.

2. [The Father or the Mother] will maintain contact with DCS Case Manager.

3. The parents will not remove the children into another

unexceptable [sic] place.

4. New apartment must have lights water & heat. Apartment must be sound environment structurally.

E.

The DCS "Case Recordings" referenced in the Commissioner's opinion, and referenced indirectly in the claim, were the subject of a motion in limine to exclude as inadmissible hearsay as well as a renewed objection at trial[1]. The Commissioner admitted the Case Recordings, with limited redaction of content that was hearsay within hearsay, as collective exhibit 3. The Case Recordings each bear a date that the event "occurred on" and a "completed date." Flanary resigned his position in December 2004 by letter stating he could not handle the stress of the job. He did not testify at trial. The DCS allegedly did not know his whereabouts. The only testimony concerning the Case Recordings came from Flanary's two supervisors, Kim Crumly and Rita Parris. Parris, who also is Crumly's superior, testified that she did not know why there was a lapse in time between the date some events "occurred on" and the "completed date" of particular Case Recordings. Crumly testified that there is no requirement that Case Recordings be completed within a set time after a given event. She also testified that it is common practice, that varies according to the individual, for case workers to make hand-written notes and place them in the file until they can enter the Case Recording into the computer system. At that time, the hand-written notes usually are destroyed. There were no hand-written notes in the file for the Infant. We will summarize the Case Recordings that are in dispute in chronological order.

The first Case Recording bears the date "05/06/2004" as the date the event occurred on and the completed date. It reflects a home visit with the Mother by case manager Flanary based on a report that both she and Demitrus tested positive for marijuana when Demitrus was born. The mother admitted marijuana use during her pregnancy but claimed she used the drug because it helped with her morning sickness. Flanary recommended "that TN Early Intervention be assigned to come into the home and monitor the [Infant's] health and development", and the Mother agreed.

The next Case Recording reflects an event that occurred on "09/13/2004" with a completed date of "11/04/2004." It states that "CM was able to locate this family again" in a run-down trailer infested with rats with a "very strong trash odor in the kitchen area of the home." It reflects that Flanary told both the Mother and the Father that the living conditions

---

[1]There also were objections to relevance of references to such things as marijuana use. Relevance issues are not raised on appeal.

in the trailer were unacceptable and gave them leads on some public assistance housing options. It further reflects that Flanary made a return visit on "09/15/2004" to have the Mother sign a release and states that "CM never heard from the family again about finding an apartment or anything else."

The next Case Recording reflecting an occurrence date of 11/03/2004 and a completion date of 11/04/2004 is worth repeating the "content" in its entirety.

> 11/03/2004: CM conducted a home visit with Miss . . . Hamilton to insure that Thunder was in a safe place. CM ask[ed] Miss Hamilton to make contact with [the Mother] and have her call DCS office at 952-6087. No call received on this date.
>
> 11/04/2004: CM conducted a home visit with Ms. Robin Adams to insure that Demitrus was in a safe place. CM requested her to have [the Mother] to contact DCS office or I would need to take further action to insure the children[']s safety.
>
> 11/04/2004: CM had a message on answering service when I returned from lunch.

With one exception, all other case recordings bear a "completed date" of "11/15/2004," after Demitrus' death. Three reflect occurrence dates before the death of 11/04/2004, 11/05/2004, and 11/08/05. The 11/04 occurrence is the meeting with the parents and other DCS personnel to formulate the safety plan. Its "content" states:

> 11/04/2004: CM had a message from [the Father] that he had gotten my message to contact the DCS office. [The Father] and [the Mother] came to the office at approx. 4:00 pm. CM met with the family to inform them that the children needed to be under a DCS safety plan. . . . They both agreed to work with CM Flanary. CM ask[ed] both parents where they wanted the children to stay while they are homeless. Both parents stated . . . Shareika Hamilton. They stated that aunt Robin Adams had mental health problems and she would not be a good resource for placement. CM wrote the safety plan and both parents signed the plan. Ms. Williams already had the children at her house. The parents would not report to this CM where they were staying. CM requested that they stay in touch with this office.

The "content" of the 11/05 occurrence reflects Flanary's actions in securing the signature of his supervisor, "Kim Crumly, CM3," DCS attorney Erin McArdle, and Sherika Hamilton on the safety plan. It also reflects that on 11/05, the Father called Flanary asking him to look at an apartment the Father had found.

The Case Recording for occurrence date 11/08/2004 simply reflects that Flanary complied with the Father's request and in fact delivered a "deposit check for $100" to the apartment landlord at the Father's request.

The Case Recording for 11/10/2004 reflects limited content of numerous telephone calls Flanary was involved in on the day of the Infant's death and a few days thereafter. First was a call to Flanary, who was himself traveling to Massachusetts to attend his sister's funeral, by the Father informing him that the Infant had drowned when Ms. Hamilton left him unattended in a bath tub. Next was a call from Flanary to his supervisor Crumly to find out what happened and provide any information Crumley requested. Later, there were two calls from the Father to Flanary, the first of which Flanary missed. The Father left a message on November 11, 2004, that he was taking Thunder and that DCS "would never find him again." Flanary answered a call on November 15, 2004, in which the Father inquired whether the Department would still provide assistance to him in renting an apartment.

The final Case Recording was made on November 30, 2004, by Kim Crumly reflecting her conversations with various individuals at the hospital on the day Demitrus drowned. She arrived before the Infant had been pronounced dead after receiving a telephone call from police investigator Jason East. When Demitrius was pronounced dead, Crumly reported the death to her supervisor who told her to continue the investigation. She saw to it that Thunder was brought to the hospital at the request of the Father and the Mother. She talked to the Father and the Mother who "reported that [Flanary] had done much to help them and they appreciated all the help he had given." Crumly's supervisor "agreed that Thunder could go home" with his aunt, the Mother's sister. Crumly followed investigator East to the police department where they were advised that Hamilton had "confessed to leaving the child alone while she made the bed in another room."

The Commission treated the Case Recordings as admissible under both Tenn. R. Evid. 803(6) and 803(8). The Commission explained:

> [T]hose . . . case recording entries prepared by Mr. Flanary and admitted at trial are indeed admissible since they were identified by foundational witnesses Par[r]is and Crumley and were prepared within relative proximity to the dates of the events recounted therein. These reports appear to the Commission to

be typical of reports regularly prepared by DCS case workers – such as Flanary – in fulfillment of their normal job responsibilities. Preparing such reports clearly appears to be a proper exercise and implementation of those powers granted DCS under Tennessee Code Annotated, section 37-5-106(1) as the Department through its employees, attempted here to attain the purpose for which it was created as set out in Tennessee Code Annotated, section 37-5-102.

Significantly, in large part, what Mr. Flanary recorded was also testified to by the Claimants. In those few instances where case recording entries . . . were excluded, the Commission was not able to identify an exception to the hearsay rule permitting the introduction of hearsay within hearsay.

Additionally, Tennessee Rules of Evidence, Rule 803(8) provides a second avenue for the admissibility of some of these allegedly hearsay statements. . . . .

\* \* \*

Here, the records sought to be introduced by the State are "records [and] reports" made by an agency charged with protecting the welfare of children and "setting forth the activities of [that] office".

The Commission FINDS that with the exceptions noted above, the majority of the statements contained in Collective Exhibit 3 . . . are admissible under the provisions of Tennessee Rules of Evidence, Rules 803(6) [and] (8) . . . as exceptions to the hearsay rule.

F.

The Commission's findings as to liability provide a helpful frame of reference as to how some of the factual issues, including witness credibility, were resolved.

All parties involved in this case, as well as the Commission, obviously acknowledge that the death of young Demitrus . . . . was a tragedy. There can be no doubt whatsoever regarding that

proposition. The issue now before the Commission is whether or not the State of Tennessee was negligent in causing that death and therefore, is liable to the Claimants under the Tennessee Claims Commission Act.

The proof presented throughout the trial of this matter shows clearly that both Demitrus and his older half-brother, Thunder . . . , were living in a chaotic situation.

Demitrus was born to a mother who chose to use a controlled substance while she was pregnant with him. The Commission finds no evidence whatsoever in this record that the use of marijuana has ever been found to be indicated in connection with an expectant mother's pregnancy related symptoms. In fact, the Commission categorically does not believe [the Mother]'s testimony that this is why she was using marijuana while she was pregnant with Demitrus.

Further, at the time of Demitrus' death, neither of his parents was working and, in fact, [the Father] testified that he "wasn't around a lot" during the pregnancy.

Following revelation by medical personnel at the Johnson City Medical Center that both [the Mother] and her infant son had evidence of marijuana in their systems, Mr. Flanary of DCS contacted [the Mother] in connection with the TennKids Early Intervention Program. Apparently, this program is designed to monitor the development of at risk children following birth. The program seems to be directed at assessing a child's growth in light of adverse birth circumstances, which here involved the [M]other's drug abuse while pregnant. A case recording from November 15, 2004, which the Commission found to be both admissible and relevant, also documents Mr. Flanary's frustration with the parents for not staying in touch with him after he became involved in their lives. In fact, a case recording prepared by Mr. Flanary on November 4, 2004, before the child's death, indicates that he found the family by happenstance on September 13, 2004, and returned the following day to obtain [the Mother]'s signature on a release which was needed in connection with his work with the family. The fact that Mr.

-13-

Flanary was still attempting to obtain signatures on documents from the family in connection with DCS's efforts on their behalf nearly five months after the child's birth is indicative of their failure to maintain contact with him following [the Mother]'s release from the hospital after Demitrus' birth and placement in the TennKids Early Intervention Program.

Additionally, it is abundantly clear from the proof in this case that both parents were abusing marijuana, or as [the Father] called it "herb" or "weed", which he testified he sometimes bought from Sherika Hamilton. The Commission finds that [the Mother] certainly was using marijuana before the birth of her child Demitrus and, along with [the Father], in all likelihood, both before and after Demitrus' birth.

Further, the Commission does not believe Claimants' testimony that they objected to the placement of the two children with Sherika Hamilton during the seven day period called for by the Child Safety Plan which they voluntarily signed on November 4, 2004. Both parties had known Ms. Hamilton for an appreciable period of time. She had visited with them in Asheville, North Carolina, before they moved to Johnson City. Either [one or both of the parents] had lived with a relative of Ms. Hamilton's when they first moved to Johnson City. Ms. Hamilton lived in the same apartment complex (Tyler Apartments) where [the Mother] had, in 2002 and part of 2003, been the night manager, and where Claimants also lived before inexplicably leaving that apartment and eventually moving into a ramshackle trailer in Johnson City where they were residing with five to six month old Demitrus and his older half-brother, Thunder, until mid-October 2004, when they were forced to leave that home because of insufficient heat.

At that point, Thunder was deposited by [the Father] and [the Mother] with Ms. Hamilton with whom [the Mother] had lived while she was pregnant with Thunder . . . , and who she had chosen to be Thunder's godmother. At the same time, Demitrus was in the home of [the Mother]'s aunt, Robin Adams, who had just recently moved into the Tyler Apartments where Ms. Hamilton lived. Ms. Adams' own two children were, according

to her, friends of Ms. Hamilton, and Ms. Adams described Ms. Hamilton as being "nice". Even while the Safety Plan was in effect, the proof is that [the Mother] and [the Father] visited with the children after November 4, 2004, at Ms. Hamilton's home. In fact, when Ms. Hamilton was cited by the Johnson City Police for child endangerment on November 9, 2004, for leaving children unattended at Tyler Apartments, she went to Ms. Adams' apartment to report what had happened, leaving both Demitrus and Thunder there while she completed the legal paperwork with the police officers.

Both of these Claimants have a significant amount of college education. In fact, [the Mother] had studied social work at East Tennessee State University where she had a 3.6 average. The Commission does not believe that [DCS] personnel forced Sherika Hamilton on [the Mother and the Father] as a placement choice on November 4, 2004, or that they did not understand that there were legal options available to them if they did not agree with the contents of what the evidence shows was a voluntary plan.

These Claimants are both far too intelligent to have meekly accepted Ms. Hamilton as a seven day placement resource if in fact they actually had sincere objections to their longtime friend's home as a place for the children to live until they were able to locate adequate housing.

The proposition that there was something dramatically awry in the . . . family unit in November of 2004, is also borne out by other facts in this case. Although [the Father] has college training in a technical area, the proof shows that he was convicted two times in the last ten years of being in possession of stolen property. In fact, he had just been released from the State of North carolina's penal system shortly before he met [the Mother] in Asheville in 2002.

Further, when [the Father] and [the Mother] began their relationship in 2002, [the Mother] was still legally married, and still is, to a man she claims not to have seen since 1998. Additionally, following her separation from that gentleman, she

had become pregnant by another man, who is the father of her son, Thunder . . . .

Further, shortly after Demitrus' birth in 2004, [the Mother] attempted suicide. Following this frightening event, it was not [the Father] who was summonsed to care for Demitrus and Thunder while [the Mother] was hospitalized in Johnson City and Knoxville, Tennessee. Rather, friends and family of [the Mother] stepped in to assist with the children's care during [the Mother]'s hospitalizations. In fact, initially, [the Mother]'s good friend, Rebecca Rowe, first took Thunder . . . to Sherika Hamilton's following the suicide attempt. Eventually, [the Mother]'s sister picked Thunder up. During this entire period, the children's caregivers changed some three to four times and there is no proof that [the Father] was involved with the two boy's care during this very disturbing episode.

There is also no proof in this record that Sherika Hamilton was being paid by the State of Tennessee for caring for her friends' two children under the CPS Safety Plan. In fact, the State presented testimony that it did not pay her anything for taking care of the children.

Although Ms. Hamilton's conduct in leaving six and one-half month old Demitrus in a bathtub alone obviously was quite negligent, in other respects Ms. Hamilton's actions appear to be admirable. The Claimants themselves had permitted Thunder . . . to stay with Ms. Hamilton in the past, and he was with her before November 4, 2004, when Claimants were having shelter problems. [The Father] testified that Thunder loved Ms. Hamilton. The proof is also unrebutted that beginning on November 4, 2004, Ms. Hamilton agreed to open her home to both children – apparently on a completely uncompensated basis – while Claimants attempted to rectify their housing problems.

The fact of the matter is that both of these educated, intelligent Claimants voluntarily signed a Plan which provided that the children would stay with Ms. Hamilton for at least seven days. Their signatures on the Plan, therefore, are more telling than perhaps would be the case with less intelligent and less educated

-16-

individuals.

The Claimants, at trial, obviously objected to the actions of Case Manager Michael Flanary and have alleged that those actions "partially" caused the death of their son.

However, the proof shows undeniably that throughout Demitrus' brief life, Mr. Flanary tried to better his circumstances. From the outset, Mr. Flanary attempted to enroll the child in the TennKids Early Intervention Program because of the possible after-effects of his mother's use of marijuana while she was pregnant with him. In July of 2004, when his mother attempted suicide, Mr. Flanary contacted Ms. Cook while she was hospitalized. Even later, in September of 2004, in connection with his work with another family, Mr. Flanary encountered the . . . family living in a sub-standard mobile home in urban Johnson City. The proof also indicates that Flanary had difficulties keeping in contact with the family because of their failure to apprise him of their whereabouts. A case recording prepared on November 4, 2004, again before the child's death, documents that in light of the circumstances Flanary found the family living in around mid-September of 2004, he gave [the Mother] information regarding possible housing options and of the possibility of State assistance in defraying moving expenses. On September 15, 2004, Flanary returned to the Unaka Avenue mobile home in order to obtain [the Mother]'s signature on a release which the Commission believes he needed in connection with Demitrus participation in TennKids Early Intervention Program.

The case recordings and proof at trial show that from November 3, 2004, even up to the date of the child's death, Mr. Flanary attempted to help the . . . family locate and pay for a decent place to live, even to the point that on a day off from work [November 9, 2004] just before leaving for his sister's funeral in Massachusetts, he took a deposit check on the family's new apartment to the landlord since [the Father and the Mother] had no means of transportation. That these efforts were appreciated is evidenced by Ms. Crumly's testimony that on November 10, 2004, while at the hospital following Demitrus' death, [the

-17-

Mother] and [the Father] told her that they appreciated what Flanary had done for them. On November 15, 2004, [the Father] even contacted Mr. Flanary and inquired as to whether he could still assist the family in finding an apartment.

The Commission FINDS that both Flanary and the Department tried mightily to assist this family, including Demitrus, at a time when their lives were seriously unsettled and the children's welfare clearly in jeopardy. The Commission does not believe that Mr. Flanary's resignation from the Department on December 1, 2004, resulted from anything other than his grief over the child's death. The Commission does not find that this resignation can or should be considered as some sort of admission of guilt by him.

The proof is overwhelming that Flanary engaged in several efforts on behalf of the . . . family designed to shelter Demitrus and Thunder from the poor circumstances they were living in.

The Claimants' claim seems to be based on the proposition that since they were not homeless on November 4, 2004, a Child Safety Plan should never have been put in place and that had the plan not been created, the child would not have been with Sherika Hamilton on November 10, 2004, when she temporarily left the bathroom to make a bed and he drowned. Claimants insist that the Commission should isolate its analysis to whether or not their family was homeless at the time and ignore other evidence regarding why that homelessness occurred. In other words, Claimants allege that since they were not homeless on November 4, 2004, a Child Safety Plan was not necessary and the fact that it was implemented put Demitrus in harm's way by placing him with Sherika Hamilton. Following Claimants' logic, had the child not been with Sherika Hamilton at the time, then she never would have left him in the bathtub alone thus creating an opportunity for a drowning episode. Claimants also rely heavily on the contention that consistently, between November 4 and November 10, 2004, they requested the return of their children and the termination of the Child Safety Plan but were denied even up until November 9, 2004, when Ms. Hamilton was charged with child endangerment, a fact also they

-18-

relayed to Case Manager Flanary.

Claimants alleged at trial a procedural failing on the part of the State since a complete background check was not done on Sherika Hamilton prior to the implementation of the November 4, 2004, Child Safety Plan. However, that plan was voluntarily signed by all parties late . . . on November 4, 2004, and the next day by Mr. Flanary's immediate supervisor as well as a departmental attorney. It appears that the Department moved forward with the process as quickly as humanly possible and that immediate action appeared to be necessary in light of the fact [that the Mother] and [the Father] had already placed their children in two separate homes and were not forthcoming with Mr. Flanary about where they were living and where the family would live in the coming winter.

Additionally, the claimants fault the Department for not having conducted a complete background check on Sherika Hamilton. However, the proof is abundant that [the Mother] and [the Father] knew Ms. Hamilton well, and that they voluntarily entered into a plan under which both Demitrus and Thunder would live in Ms. Hamilton's home for seven days, a short distance from Ms. Adams' home where claimants contend they were living at the time. Further, although a complete background check apparently was not done, Supervisor Rita Par[r]is testified she reviewed DCS records for any history of problems Ms. Hamilton may have had.

A troublesome issue raised by the claimants is their contention that [the Father] contacted Mr. Flanary by cell phone as Flanary was traveling to Massachusetts for his sister's funeral and informed him, on November 9, 2004, that Hamilton had been charged that day with child endangerment as described above. [The Father] claims that Flanary told him he did not have time to deal with that situation as he was on his way home for his sister's funeral. Ms. Crumly testified that Mr. Flanary should, nevertheless, have looked into the situation and that there is no record that he did so after his phone conference with [the Father]. Ms. Crumly also testified that if Mr. Flanary was having problems communicating by cell phone with [the

-19-

Father], he should have told [the Father] to contact someone else at the Department at the time.

The Commission does not believe that these relatively minor procedural mistakes are sufficient to establish [the] claim by a preponderance of the evidence. The proof is overwhelming in this record that Sherika Hamilton had been close to both of these claimants for a number of years. Ms. Hamilton was godmother to . . . Thunder and the testimony shows that Ms. Hamilton visited them in Asheville and that for a period of time, after returning to Johnson City, either one or both of the claimants lived in the home of a relative of Ms. Hamilton. In fact, when Ms. Hamilton was charged with child endangerment, she went immediately to the apartment where [the Mother] and [the Father] were supposedly staying at the time. Also, [the Mother] and [the Father]'s objections to Ms. Hamilton appear to be quite disingenuous since not only was Ms. Hamilton the godmother of . . . Thunder but apparently neither [the Mother] or [the Father] objected to Thunder staying with Ms. Hamilton even though [the Father] testified she was selling marijuana out of her home.

Failings on the part of Mr. Flanary and the Department pale in comparison to the factors which lead the Department to believe that the . . . family was homeless and in need of the implementation of a Child Safety Plan for their two children.

The Commission FINDS that the circumstances of Demitrus' death were purely accidental and caused by the negligence of Ms. Hamilton in leaving him in a bathtub unattended while she made the bed in another room. This, quite obviously, was a severe lapse in judgment on her part as all seem to agree that a child six and one half months old should never be left unattended in a bathtub.

Based upon these findings the Commission found that the claim failed "for three reasons," some of which are redundant. First, it found that there was not a "breach of the

admitted duty owed to Demitrus. There is simply no way that Mr. Flanary or any other state employee could have foreseen that Ms. Hamilton, a longtime friend of the claimants would be so negligent as to leave a small child alone, for any period of time, in a bathtub of water." Second, it found, "given the fact that the Commission believes the cause of Demitrus' death was the unfortunate negligence of Ms. Hamilton, we . . . find that any of the activities or alleged failings of the State and its employees in this case [were not] a substantial factor in the child's drowning." Third, it found that the Department's actions could not be the proximate cause of the death because "there has been no showing that a person of ordinary intelligence and prudence did or could have reasonably foreseen what happened to Demitrus . . . on the evening of November 10, 2004 . . . ."

II.

The Claimants purport to state a multitude of issues in a narrative format that we do not find helpful in understanding the case. The State asserts a challenge to subject matter jurisdiction as its own separate issue.[2] We will summarize the issues in the order we intend to address them without regard which party has raised them.

> Whether the Commission had subject matter jurisdiction over this case as one involving the "care, custody and control" of a person pursuant to Tenn. Code Ann. § 9-8-307(a)(1)(E)(Supp 2010 & 1999).

> Whether Sherika Hamilton was the agent of DCS for whom it could be held liable.

> Whether some or all of the Case Recordings were inadmissible hearsay.

> Whether the evidence preponderates against the Commission's finding that the drowning was not foreseeable.

---

[2]Out of concern that we may not have had jurisdiction, early in the case we ordered the parties to brief the issue of whether the notice of appeal was timely. The State concedes in its brief that the "[C]laimants' filing of a notice of appeal . . . was within the thirty day period provided for under" Tenn. R. App. P. 4(a) because the order was not entered until several days after it was signed. We are satisfied with the State's concession and will not discuss the issue further.

## III.

The standard by which we review actions of the Commission is the same as the standard for reviewing actions of a trial judge in a court of record. *See Bowman v. State*, 206 S.W.3d 467 (Tenn. Ct. App. 2006).

> Appeals from decisions by the Commission . . . are governed by the Tennessee Rules of Appellate Procedure. Tenn. Code Ann. § 9-8-403(a)(1) (Supp.2005). Accordingly, because the Claims Commission hears cases without a jury, this court reviews the Commission's factual findings and legal conclusions using the now familiar standard in Tenn. R. App. P. 13(d). Thus, we will review the Commission's findings of fact de novo with a presumption that they are correct unless the evidence preponderates otherwise. *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991); *Dobson v. State*, 23 S.W.3d 324, 328-29 (Tenn. Ct. App. 1999); *Sanders v. State*, 783 S.W.2d 948, 951 (Tenn. Ct. App. 1989). The Commission's legal conclusions, however, have no similar presumption of correctness. *Turner v. State*, 184 S.W.3d 701 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Oct. 24, 2005); *Crew One Productions, Inc. v. State*, 149 S.W.3d 89, 92 (Tenn. Ct. App. 2004); *Belcher v. State*, No. E2003-00642-COA-R3-CV, 2003 WL 22794479, at *4 (Tenn. Ct. App. Nov.25, 2003), *perm. app. denied* (Tenn. May 10, 2004).

*Id*. at 472. As to factual disputes for which the Commission makes no factual findings, we are empowered to make our own findings based on our *de novo* review for the preponderance of the evidence. *Kesterson v. Varner*, 172 S.W.3d 556, 566 (Tenn. Ct. App. 2005). Of course, there is no presumption of correctness for findings that were not made. *Id*. We employ an abuse of discretion standard in reviewing the Commission's evidentiary rulings. *See Arias v. Duro Standard Prods.*, 303 S.W.3d 256, 262 (Tenn. 2010). Under this standard, we will defer to the Commission unless it "has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence ." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

## IV.

### A.

We begin with the question of whether the Commission erred in finding that it had subject matter jurisdiction over this claim. "The jurisdiction of the Claims Commission is a question of law that we review de novo with no presumption of correctness." *Mullins v. State*, 320 S.W.3d 273, 278 (Tenn. 2010). There is a multitude of cases explaining the relationship between sovereign immunity and the subject matter jurisdiction of the Commission. *See*, *e.g.*, *Id*.; *Stewart v. State*, 33 S.W.3d 785, 790 (Tenn. 2000); *Conley v. State*, 141 S.W.3d 591, 597 (Tenn. 2004). We need not rebuild those foundations in this case. For the purposes of the present case we can start with the truth that the State retains immunity for all claims except those claims enumerated in Tenn. Code Ann. § 9-8-307(a)(Yr.). Stated another way, "the Claims Commission lacks subject matter jurisdiction and has no authority to hear any claims that fall outside the categories enumerated in section 9-8-307(a)." *Mullins*, 320 S.W.3d at 279.

The particular question we are concerned with in the present case is whether this is properly construed to be a claim arising out of the "[n]egligent care, custody and control of persons." Tenn.Code.Ann.§9-8-307(a)(1)(E).[3] In construing the breadth of the statute, we

---

[3]The complete list of "categories which the Claims Commission or each commissioner has exclusive jurisdiction to hear are:"

> (A) The negligent operation or maintenance of any motor vehicle or any other land, air, or sea conveyance ...;
>
> (B) Nuisances created or maintained;
>
> (C) Negligently created or maintained dangerous conditions on state controlled real property ...;
>
> (D) Legal or medical malpractice by a state employee ...;
>
> (E) Negligent care, custody and control of persons;
>
> (F) Negligent care, custody or control of personal property;
>
> (G) Negligent care, custody or control of animals ...;
>
> (H) Negligent construction of state sidewalks and buildings;
>
> (I) Negligence in planning and programming for, inspection of, design of, preparation of plans for, approval of plans for, and construction of, public roads, streets, highways, or bridges and similar structures, and negligence in maintenance of highways, and bridges and similar structures ...;

(continued...)

must be guided by the general assembly's stated "intent . . . that the jurisdiction of the claims commission be liberally construed to implement the remedial purposes of [§ 9-8-307]." *Mullins*, 320 S.W.3d at 279 (*quoting* Tenn. Code Ann. § 9-8-307(a) Supp. 1985)). Nevertheless, we must not forget the "general rule that statutes permitting lawsuits against the State 'are in derogation of the state's inherent exemption from suit and must be strictly construed.' " *Mullins*, 320 S.W.3d at 279 (*quoting **Beare Co. v. Olsen***, 711 S.W.2d 603, 605

---

[3](...continued)

(J) Dangerous conditions on state maintained highways ...;

(K) Workers' compensation claims by state employees ...;

(L) Actions for breach of a written contract between the claimant and the state ...;

(M) Negligent operation of machinery or equipment;

(N) Negligent deprivation of statutory rights created under Tennessee law, except for actions arising out of claims over which the civil service commission has jurisdiction ...;

(O) Claims for the recovery of taxes collected or administered by the state ...;

(P) Claims for the loss, damage or destruction of the personal property of state employees based on § 9-8-111;

(Q)(i) Claims for injuries incurred by persons where such injury occurred while the person was a passenger in a motor vehicle operated by a state employee while such employee was acting within the scope of employment....

(R) Claims for libel and/or slander ...;

(S)(i) Claims for compensation filed under the Criminal Injuries Compensation Act....

(T) Actions based on § 69-1-201;

(U) Actions based on violations of the requirements of procurement of commodities or services ...; and

(V) Unconstitutional taking of private property[.]

*Mullins*, 320 S.W.3d at 279-80(*quoting* Tenn.Code Ann. § 9-8-307(a)(1)).

(Tenn. 1986)). The practical effect of these competing principles upon the statutory language has been explained for us by the Supreme Court. In ***Northland Ins. Co. v. State***, 33 S.W.3d 727 (Tenn. 2000), the Court stated that "liberal construction of an existing category . . . is a different proposition than a construction creating a *new* category." ***Id***. at 730 (emphasis in original). In ***Stewart***, the Court stated,

> A policy of liberal construction of statutes, however, only requires this Court to give the most favorable view in support of the petitioner's claim, and such a policy does not authorize the amendment, alteration or extension of its provisions beyond [the statute's] obvious meaning. Moreover, where a right of action is dependent upon the provisions of a statute . . . we are not privileged to create such a right under the guise of a liberal interpretation of it.

33 S.W.3d at 791 (internal quotation punctuation and citations omitted, brackets and omissions in original). The policy of liberal construction is thus best invoked "in cases where the statutory language legitimately admits of various interpretations." ***Id***.

In ***Mullins***, the Court considered the issue of "whether the Tennessee Claims Commission had subject matter jurisdiction to hear a claim against the State of Tennessee arising from the death of a young child who had been removed from his mother's home and placed in the custody of the mother's aunt by order of the juvenile court." 320 S.W.3d at 275. The Court provided this succinct summary of the facts of the case:

> The child and his two brothers were removed from their mother's care because of her use of cocaine. At the mother's request and after an investigation, the Department of Children's Services recommended to the juvenile court that custody of the children be awarded to the mother's aunt. Less than a month after the court entered the order of custody, the mother reported concerns about the children's well-being to the Department. A case worker investigated the aunt's home and found no basis to remove the children. Ten days later, one of the children, a five-year-old boy, died from extensive injuries allegedly inflicted by the aunt's nineteen-year-old daughter who lived in the home.

*Id*. The Court held "that the Claims Commission did not have subject matter jurisdiction to hear the claim because the child was not in the care, custody, and control of the State." *Id*.

The State's position in the present case is that *Mullins* controls this case and requires a holding that the Commission does not have jurisdiction. The holding of *Mullins* is obviously important, but it is equally important that we understand what *Mullins* did not hold. *Mullins* affirmed that part of this court's judgment which "held that the Claims Commission did not have jurisdiction to hear claims alleging negligence by DCS that occurred *after the juvenile court's order* granting custody to [the aunt] and the placement of the children in her home." *Id*. at 278 (emphasis added). The issue of the correctness of this court's ruling "that the Claims Commission *had jurisdiction to hear Ms. Mullins' claim relative to [the child's] placement with [the aunt], because at that time, DCS had custody and control* of [the child] and concurrent responsibility for his case" was not raised before the Supreme Court and was not addressed. *Id*. & n.4 *(emphasis added)*. With regard to the issue and facts before it, the High Court stated that the claim under consideration "is more appropriately characterized as one for negligent investigation, a category the legislature did not include in section 9-8-307." *Id*. at 283. The *Mullins* Court approved the holding of both *Holloway v. State*, No. W2005-01520-COA-R3-CV, 2006 WL 265101 (Tenn. Ct. App. W.S., filed Feb. 3, 2006) and *Draper v. State*, No. E2002-02722-COA-R3-CV, 2003 WL 22092544 (Tenn. Ct. App. E.S., filed Sept. 4, 2003), "that the Claims Commission did not have jurisdiction of a claim for negligent investigation of a referral for possible child abuse." *Mullins*, 320 S.W.3d. at 282.

The bright line that separates the present case from *Mullins* is that the only claim being examined by the High Court in *Mullins* for jurisdiction was based on facts, *i.e.*, the negligent investigation, that came *after* the child was placed in a third party's custody by court order. The Court expressly stated that the "State did not have care, custody, or control of [the child] after the juvenile court awarded custody of him to [the aunt] – at this point, [the aunt] was the only one who had custody of [the child] and thus the responsibility and obligation to provide care for him and control over him." *Id*. Thus, the only basis for jurisdiction would have been the lone act or omission of negligent inspection for which there existed no private right of action.

In the present case, the was no such court order placing custody in Ms. Hamilton. Hamilton had the Infant as the "placement custodian" as a result of the safety plan which was initiated by the Department. In our opinion in *Mullins*, we held that the Commission *had jurisdiction* over the "one claim" concerning the Department's actions that preceded the court ordered placement with the aunt. That "one claim . . . that falls within this time frame is the contention that DCS was negligent in its investigation of the [aunt's] home prior to [the child's] placement there [by court order]." 2009 WL 1372209 at *9. We distinguished the

facts before us in ***Mullins*** from the facts of ***Draper*** and ***Holloway***, stating,

> In this case, unlike ***Draper*** and ***Holloway***, there is a period of
> time that the State had taken custody of the child.  When [the
> child] was initially removed from [his m]other's home by DCS,
> he was clearly in the care, custody, and control of the State.  In
> T.C.A. § 37-2-402(5)[now § 37-1-102(15)], "foster care" is
> defined as
>
>> the temporary placement of a child in the custody
>> of the department of children's services or any . .
>> . home, whether public or private, for care outside
>> the home of a parent or relative (by blood or
>> marriage) of the child, whether such placement is
>> by court order, voluntary placement agreement,
>> surrender of parental rights or otherwise. . . .

*Id*. at *8.

The Commission determined in the present case that the Infant was not in the custody
of the DCS, but was nevertheless in the control of the DCS.  The High Court in ***Mullins***
recognized that the mere lack of legal or physical custody is "not entirely determinative."
320 S.W.3d at 281. The proper inquiry is whether the State's involvement is such that it may
be fairly said to have exercised *either* care, custody, *or* control.  *Id*. (*analyzing **Hembree v.
State***, 925 S.W.2d 513, 517 (Tenn. 1996)(jurisdiction over release of a mental patient into
the community); ***Stewart***, 33 S.W.3d at 792 (read in the disjunctive so that failure to exercise
control will give jurisdiction if there was a legal duty to control or actual control assumed but
negligently exercised) ; and ***Conley***, 141 S.W.3d at 591(no jurisdiction for negligent pre-
admission screening because no showing that limited involvement devolved into control).
The inquiry is made in the disjunctive; the State need not have exercised all three functions.
***Stewart***, 33 S.W.3d at 792.

Following the guidance we have been able to glean out of the cases, with particular
reference to that part of our opinion in ***Mullins*** that was not at issue on appeal to the High
Court*,* we hold that jurisdiction was proper in the present case.  This case is not controlled
by the Supreme Court's opinion in ***Mullins***, because of the distinctions we have discussed.
Our opinion in ***Mullins*** suggests that the mere fact that the parents consent does not prevent
the placement from being one that would invoke jurisdiction for "care, custody and control"
pursuant to Tenn. Code Ann. § 9-8-307(a)(1)(E).  It also suggests that a DCS initiated
removal of a child out of the care of the parents and placement in another home, however

-27-

temporary, and however parental friendly, will invoke jurisdiction. However, given the record in the present case, we need not go that far to find jurisdiction. As found by the Commission, the record indicates that unless the parents had called Flanary on the day he found Thunder and Demitrus in separate homes, he would have intervened through some channel more drastic than a "team meeting." The team meeting did happen, at which time DCS told the parents – it did not ask – that the situation must change. Once the team meeting was conducted, specific standards were set which (1) required that the children remain with Hamilton, (2) required that the parents maintain contact with DCS, (3) forbade the parents from moving the children to a place not approved by DCS, and (4) required that any new residence be approved by DCS. According to the testimony of DCS employees, the children could not be returned to their parents without a second meeting between the parents and a DCS decision maker. The safety plan itself characterizes the situation with Hamilton as a "placement" of the children. According to DCS employee Crumly, the term "placement" is generally synonymous with "custody." A safety plan generally is considered by the Department to be an "intrusive" measure. The regulations that the Department follows to implement a safety plan confirm a high level of DCS involvement, as found by the Commission. In short, we agree with the Commission that the facts in this case establish DCS control sufficient to establish jurisdiction in the Commission. This is not a situation where we are being asked to create a "new category." *See* **Northland**, 33 S.W.3d at 730. Rather, this is a situation "where the statutory language legitimately admits of various interpretations" and we are simply following the General Assembly's instructions to "give the most favorable view in support of the . . . claim." **Stewart**, 33 S.W.3d at 791 (citations and internal quotation marks omitted).

Before moving to another issue, we think it important to note that we do not agree with all of the Commission's reasons for exercising jurisdiction. One of the stated reasons was that the Department's actions created a duty toward the Infant, which, "based on the facts in this case, fits the Claimants' allegations into the care and control criteria . . . ." **Mullins**, **Holloway**, and **Draper** all indicate that, especially in this area of DCS involvement with children, duty cannot be even roughly equated with jurisdiction. Further, the Commission indicated that it was basing jurisdiction on actions that dated all the way back to the first home visit near the time of the Infant's birth. We do not necessarily disapprove of looking at the totality of the State's involvement in a given case, but we want any reader of this opinion to understand that a simple home visit which goes no further than to make constructive suggestions for a positive home life does not come close to "care, custody and control" within the meaning of Tenn. Code Ann. § 9-8-307(a)(1)(E).

B.

Having concluded that the Commission had jurisdiction over the claim, we will briefly

address the Claimants contention the Hamilton was an agent of the State for which it could be held liable. This contention is based upon the theory that the State, by and through Flanary, forced Hamilton upon the parents as the placement caretaker. The Commission found to the contrary. The evidence does not preponderate against the Commission's findings with regard to the parents' involvement in the choice of Hamilton. Moreover, even if we disagreed with the Commission's findings and found that somehow Flanary forced Hamilton on the parents, that does not make the state liable for Hamilton's actions. The only "acts of omissions" for which the State may be held liable under Tenn. Code Ann. § 9-8-307 are those of "state employees." Hamilton was not an employee and there is no showing in this record that Flanary could somehow deputize her into being an employee. The Commission specifically found that Hamilton was not compensated and was simply acting as a friend. The evidence does not preponderate against that finding. The State correctly points out in its brief that, while the definition of "employee" includes "a foster parent under . . . contract with the state of Tennessee," Hamilton was not under contract and was not a "foster parent." *See* Tenn. Code Ann. § 8-42-101(3)(Supp. 2010). The argument that Hamilton was an agent of the Department for whom it could be liable is without merit.

C.

We move now to the issue of whether some or all of the Case Recordings should have been excluded as inadmissible hearsay. There is no question that the Case Recordings are hearsay as defined in Tenn. R. Evid. 801. They are therefore inadmissible unless they fit within an exception. Tenn. R. Evid. 802. The burden to establish that hearsay fits within an exception to the hearsay rules is on the proponent of the evidence. **Godbee v Dimick**, 213 S.W.3d 865, 895 (Tenn. Ct. App. 2006); *see* **State v. Stamper**, 863 S.W.2d 404, 405 (Tenn. 1993). The Commission found that the Case Recordings fit within the "business records" exception of 803(6) and the "public records" exception of 803(8). We will look at the rules in turn.

The hearsay exception commonly called the "business records" exception is found at Tenn. R. Evid. 803(6). It states:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness ...,

unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

For a document to be admitted as a business record, it must satisfy five criteria. They are:

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Arias*, 303 S.W.3d at 263(*quoting Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995)). As to whether the Case Recordings fit within the business records exception, about all the State's brief says is that DCS witnesses identified the documents as DCS Case Recordings and that the Commission, in its discretion, properly found the documents admissible. Based on our own review of the record, we are satisfied that the second, third, and fourth foundational criteria were present. The trouble, if any, is with the first and fifth. Those are the criteria that the Claimants challenge. Again, we will take these components one at a time.

There is precious little evidence in this case whether or not the Case Recordings were made "at or near the time" of the event recorded. The face of the documents purport to record the date of the event and the "completed" date of the report. There is no testimony about what those terms mean, so we are left with nothing but the face of the documents to inform our decision whether the Commission abused its discretion.

Neither party has cited any cases interpreting what the timing must be for a document to be prepared "at or near the time" of the event recorded. We have found only scant authority in our own research. A treatise often cited in Tennessee cases provides, *in toto*, one short paragraph discussing the requirement.

> Rule 803(6) mandates that the memorandum must have been "made at or near the time" of the event . . . contained in the record. This requirement precludes admissibility of reports drawn up long afterwards, when memories may be hazy. It should be noted, however, that federal authorities interpreting the same language have been liberal in determining whether the memorandum was made in a timely fashion. The key issue is whether the lapse of time between the event and the record of the event interferes with the likely accuracy of the business record.

*Cohen, et al.*, Tennessee Law of Evidence § 8.11[7] (Fifth Ed. 2005). A footnote to the text concerning "federal authorities" refers to ***Seattle-First Nat'l Bank v. Randall***, 532 F.2d 1291, 1296 (9th Cir. 1976), as a federal case requiring the record to be made "contemporaneously" with the event or a "reasonable" time thereafter. In the pocket part, the treatise refers the reader to ***Godbee***, 213 S.W.3d at 865, as the one state court case on point. In ***Godbee***, the trial court had allowed the defendant doctor in a medical malpractice trial to admit, pursuant to Tenn. R. Evid. 803(6), a letter from a colleague asserting, essentially, that the defendant did not violate the standard of care. The letter was written approximately one year after the MRI which the defendant allegedly misread. This court held that letter was not made at or near the time of the occurrence, the MRI. *Id*. at 895. All that ***Godbee*** tells us is that one year after the event or occurrence is too late.

In the absence of any better source, we adopt the reasoning of *Cohen, et al.*, that "[t]he key issue is whether the lapse of time between the event and the record of the event interferes with the likely accuracy of the business record." We believe it captures the essence of the rationale for admitting business records as a hearsay exception.

Applying that rationale to the facts of the present case, we conclude that the Case Recording "completed" on "05/06/2004" recording a home visit that "occurred on" "05/06/2004" was properly admitted as a business record. We conclude that the Case Recording "completed" on "11/04/2004" reflecting events on "09/13/2004" and "09/15/2004" were not admissible as business records. We hold that in the absence of proof that Flanary had some phenomenal memory, or interim notes that captured the events and allowed him to record them later, or some other explanation of why the documents were

accurate despite the lapse of over a month, the State, as the proponent of the evidence failed to make the required showing that they were made "at or near the time" of the occurrence. The testimony of Crumly at best creates a *possibility* that Flanary may have, depending on his individual preferences, made some interim notes. We review this evidentiary ruling under the more lax abuse of discretion standard but hold that the error comes from the Commission's failure to either apply the "at or near the time" component of the business records exception, or to hold the State to its burden of proving that component. The Case Recording "completed" November 4, 2004, concerning home visits of the children at separate homes on November 2 and November 4, 2004, was properly admitted. Finally, we cannot say that the Commission abused its discretion in admitting any of the Case Recordings "completed" on November 15, 2004, or the final entries made by Crumly on November 30 as business records. With the one exception of Crumly's lengthy entries concerning her investigation of the death, the longest lapse of time is eleven days. During those eleven days Flanary's sister died and he understandably attended her funeral in Massachusetts. The only fact of which we are aware that weighs somewhat against admitting the records is the fact that Demitrus died between the time of some of the events and the completion date of the records.[4] The Claimants, in fact, argue that this timing makes the records more likely to have been prepared for litigation, and therefore untrustworthy and inadmissible. This same argument was made to the Commission and rejected by the Commission. The Commission noted, correctly, that most of the events reflected in these same records were established to be consistent with the records through independent testimony. Moreover, the Commissioner had the opportunity to view the witnesses, and we accord considerable deference to his first-hand experience with the witnesses. In short, we cannot find that the Commission failed to apply the correct legal standards or that he applied incorrect facts in making his determination as to the Case Recordings "completed" on November 15, 2004 and November 30, 2004. Therefore, we find no abuse of discretion.

Before moving to another issue, we must consider whether the Commission erred in finding that the Case Recordings reflecting events of "09/13/2004" and "9/15/2004" qualified as public records admissible pursuant to Tenn. R. Evid. 803(8). If they were admissible under 803(8), it matters not that we have held them inadmissible under 803(6). Rule 803(8) states:

---

[4]Apparently, Crumly made one other note concerning an unsubstantiated report by the Father that Flanary and Hamilton had some sort of inappropriate relationship. Crumly's superior, not Parris, told her to note the allegation in a hard copy and not in the computerized data base used for Case Recordings. The hard copy was not produced in discovery. We will not impute "[un]trustworthiness" to the whole Case Recording data base simply because of one note made somewhere else in the DCS system of an unsubstantiated allegation.

> Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, excluding, however, matters observed by police officers and other law enforcement personnel.

We agree with the Claimants that the same time lapse that rendered the particular Case Recording for the events of 09/13/04 and 09/15/04 inadmissible as business records rendered them untrustworthy as public records. This is because the "method or circumstances of preparation" include a lapse of time that would cause anyone to question whether the record reflects what happened in one particular day with one particular client when many days with many other events involving many other clients had intervened. We hold that the Commission erred in admitting the Case Recording completed 11/04/04 purporting to reflect events that occurred on 09/13/04 and 09/15/04 as public records. We disagree with the Claimants that they could not have been public records simply because they were produced subject to a protective order and were not generally open to the public. Rule 803(8) does not require that a document must be displayed for public viewing to qualify as a public record.

D.

We turn now to the merits of the dismissal of the case based on the Commission's finding that the death of Demitrus was not foreseeable to the Department. We agree with the Claimants that if the Father reported the child endangerment charge against Hamilton to Flanary or someone else at the Department, it became foreseeable to the Department at that time that harm to Demitrus from some variety of neglect by Hamilton was foreseeable. The law does not require that DCS foresee that "an injury should occur in the same exact way or to the same extent as that which did occur," *i.e.*, death by drowning after leaving an infant alone in the bathtub; all that the law requires is that DCS "foresee that some injury of a like general character is not unlikely to result from" leaving children with someone who would place them in dangerous situations and not watch them. *Spivey v. St. Thomas Hosp.*, 211 S.W.2d 450, 456 (Tenn. Ct. App. 1947). Morevover, a report such as allegedly made by the Father would make the present case analogous to *Giggers v. Memphis Housing Authority*, 277 S.W.3d 359, 365 (Tenn. 2009). In *Giggers*, knowledge that an individual who frequented a housing complex had violently assaulted one tenant in the complex established a "prima facie case of specific forseeability" of harm to other tenants. *Id.* at 367. On the other hand, if there was no such report, we agree with the Commission that there was nothing

-33-

to alert the Department that Demitrus would be neglected and left in danger by Hamilton. The case against the Department rises or falls on the determination of whether the Father alerted someone at the Department of the child endangerment charge against Hamilton.

The State argues the case as if the Commission found that the Father did not report the child endangerment to Flanary. The Claimants argue the case as if the Commission found that the Father did report the child endangerment charge against Hamilton directly and expediently to Flanary. The Commission did not make an explicit finding on this crucial issue of fact. There is, however, certainly material in the record to support both sides of the dispute. It appears that the State offered nothing, other than the absence of an entry in the Case Recordings, to contradict the testimony of the Father that he called Flanary on November 9, 2004, and reported the child endangerment charge to Flanary. The Mother and two other witnesses corroborated the Father's story. The two corroborating witness were not cross-examined on this particular point. The Commission's reference to "procedural" failings of the Department might or might not have been referring to Flanary's failure to act on the alleged report of child endangerment, either by talking directly to the parents or by passing the call on to other DCS workers. On the other side of the coin, the Commission found that both the Father and the Mother were unbelievable on many points of testimony. Our review suggests that the only testimony of the Father or the Mother that the Commission credited was testimony that was corroborated by records. The Commission might simply have believed that the corroborating witnesses were biased and disbelieved them.

We are empowered to make a determination on a factual issue that the Commission did not resolve. *Kesterson*, 172 S.W.3d at 566. In this present case, however, we believe the better course is to remand the case to the Commission for a determination of whether the Father reported the child endangerment to Flanary. There are several reasons for our determination. First, we are unsure of whether or not the Commission made the determination. We have explained that confusion. We are hesitant to make our own independent finding on the mistaken belief that the Commission made no finding. Second, even if the Commissioner made no finding, leaving us free to make our own, the Commission has an obvious advantage over us in having seen the demeanor of all the witness who testified regarding this particular fact. Third, we have previously held that some of the evidence the Commission admitted and referenced in making its decision should have been excluded. We believe it makes better sense to remand the case to the Commission for consideration of all the points on which we have provided guidance than to make piecemeal determinations whether erroneous admission of evidence was harmless error and whether the report by the Father that we deem crucial to the case did or did not happen. Accordingly,

because we read the dismissal, in all its stated reasons[5], to be based upon lack of foreseeability, and we have held that foreseeability depends on whether or not the Department was alerted to the child endangerment episode, a fact which will need to be determined and the finding articulated, we vacate that part of the judgment that dismissed the case on the merits and remand for further proceedings.

V.

The judgment of the Commission is affirmed in part, reversed in part, and vacated in part. That part of the judgment holding that the Commission had subject matter jurisdiction is affirmed as is that part of the judgment admitting the Case Recordings other than the one completed November 4, 2004, concerning events that occurred on September 13, 2004 and September 15, 2004. That part of the judgment admitting the inadmissible Case Recording is reversed. That part of the judgment holding that the State could not be liable because the death of Demitrus was not foreseeable is vacated. Costs on appeal are taxed to the appellee, State of Tennessee. This case is remanded to the Commission for further proceedings consistent with this opinion.

_____
D. MICHAEL SWINEY, JUDGE

---

[5]The Commission did not explicitly state that lack of foreseeability was the basis for its finding that the Department's actions were not a "substantial factor in the child's drowning," but that is the only way we are able to make sense of the finding. The Commission referenced "common sense" as a basis for its determination. "Common sense" suggests that if the Department knew Hamilton was placing the children that were in her home pursuant to their safety plan in danger by neglecting them, their failure to act on that knowledge was a substantial factor in causing the death that later occurred because she placed the Infant in danger of drowning by leaving him alone in the tub.